UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

AAA AUTO GLASS, INC.,            )
                                 )
            Plaintiff,           )
                                 )
v.                               )       No.:   3:24-CV-400-TAV-DCP
                                 )
ARROW AUTO GLASS OPERATING       )
COMPANY, LLC, d/b/a ARROW AUTO   )
GLASS, *et al.*                  )
                                 )
            Defendants.          )

## <u>MEMORANDUM OPINION AND ORDER</u>

This civil action is before the Court on plaintiff's Motion for Preliminary Injunction [Doc. 26]. Defendants responded [Docs. 34, 38], and plaintiff[1] replied [Docs. 36, 39]. Accordingly, this matter is ripe for the Court's review. *See* E.D. Tenn. L.R. 7.1(a). For the reasons explained below, the Court will **GRANT in part** and **DENY in part** plaintiff's motion for injunctive relief [Doc. 26].

I.      **Background[2]**

A.      **Plaintiff as a Business**

Since 2015, plaintiff has been in the business of providing windshield and window repair and replacement services [Doc. 1 ¶¶ 1, 21; Doc. 27, p. 4]. Based in Cottontown, Tennessee, plaintiff has locations in Tennessee, Florida, Kentucky, and Alabama [Doc. 1

---

[1]   At some points in this Memorandum Opinion and Order, plaintiff is referred to as "AAA."

[2]   This background is derived from the allegations contained in the complaint and plaintiff's instant motion. Internal citations are omitted.

¶ 31; Doc. 27, p. 4]. None of these locations are independently owned; rather, plaintiff is licensed to engage in business in each state where it has a location [*Id.*]. The majority of business-related activities either occur in Cottontown, Tennessee, including payroll, accounting, training, and deliveries of materials, or are associated with Cottontown, Tennessee, including the credit cards, cellphones, fuel cards, and vehicles provided to employees [*Id.*].

Plaintiff uses a program called OMEGA EDI ("OMEGA") to, among other things, prepare quotes, schedule work, open and close work orders, order parts, and prepare invoices [Doc. 1 ¶ 22; Doc. 27, p. 8]. Every employee of plaintiff has access to OMEGA, which is password protected, but the level of information accessible is dependent on an employee's role [Doc. 1 ¶ 23; Doc. 27, pp. 8–9].

Some employees had access to confidential and proprietary information uploaded to OMEGA, such as pricing agreements and discount agreements [Doc. 1 ¶¶ 23–24; Doc. 27, pp. 4–5, 9]. Other confidential information, namely, rebate agreements, were not uploaded to OMEGA and were shared on a need-to-know basis [Doc. 1 ¶ 25; Doc. 27, p. 9]. Plaintiff's handbook notifies employees of the existence of confidential information and their duty to keep it confidential:

> In the course of employment with the Company, employees may have access to "Confidential Information" regarding the Company, which may include its business strategy, future plans, financial information, contracts, suppliers, customers, personnel information or other information that the Company considers proprietary and confidential. Maintaining the confidentiality of this information is vital to the Company's competitive position in the industry and, ultimately, to its ability to achieve financial success and stability. Employees must protect this information by safeguarding it when

2

in use, using it only for the business of the Company and disclosing it only when authorized to do so and to those who have a legitimate business need to know about it. This duty of confidentiality applies whether the employee is on or off the Company's premises, and during and even after the end of the employee's employment with the Company. This duty of confidentiality also applies to communications transmitted by the Company's electronic communications. See also Internet, Email and Computer Use policy, herein.

[Doc. 1 ¶ 24; Doc. 27, pp. 9–10].

Plaintiff provides services to both individuals and companies, with services to individuals mainly being marketed through insurance companies and agents [Doc. 1 ¶ 26]. If an insurance company or agent is referred to plaintiff, the insured schedules the automobile glass work by completing an online form or calling a number [*Id.*; Doc. 27, p. 5]. A Customer Sales Representative ("CSR") or store manager will provide a quote using pricing information uploaded to OMEGA and then schedule the work and open a work order [Doc. 1 ¶ 26; Doc. 27, p. 4]. A technician, guided by the work order in OMEGA, performs the work, receives the insured's deductible upon completion, and closes the work order [Doc. 1 ¶ 27; Doc. 27, p. 5]. After all this occurs, the CSR or store manager will invoice the insurance company for the cost of the work, less the deductible paid [Doc. 1 ¶ 27]. Plaintiff works to develop relationships with these insurance companies and agents to encourage repeat business [*Id.*; Doc. 27, p. 5].

Plaintiff also provides glass repair and replacement services to companies ("Fleet customers"), mainly automobile dealerships or car rental companies [Doc. 1 ¶ 28; Doc. 27, pp. 5–6]. With Fleet customers, the company schedules the work with CSR or store

3

manager, and plaintiff invoices the company directly for the work performed [Doc. 1 ¶ 28]. Some of these Fleet customers have negotiated discounts for services [Doc. 27, p. 6].

Plaintiff derives a significant percentage of its income from insurance company customers and Fleet customers [Doc. 1 ¶ 29; Doc. 27, p. 5]. Accordingly, plaintiff hires sales representatives ("sales reps") to generate leads and develop relationships with these customer categories [*Id.*]. Sales reps have access to lists containing contact information of insurance companies, insurance agents, and companies with repeat glass work needs [Doc. 1 ¶ 29].

### B. Brandon Cottles

Plaintiff hired Brandon Cottles to be an area manager responsible for three separate locations [Doc. 1 ¶ 32; Doc. 27, pp. 10–11]. When he was hired, Cottles had decades of experience working in the glass industry, having previously worked at Glass America as a regional manager for over a decade [Doc. 1 ¶ 32; Doc. 27, p. 10]. Cottles provided upper management services for plaintiff [Doc. 1 ¶ 34; Doc. 27, p. 11]. Given his experience, Cottles was given increased access to company information, including personnel information, plaintiff's vendor rebate information, customer lists, and price lists [*Id.*].

Eventually, given Cottles's experience and prior recruitment efforts, plaintiff moved Cottles from his old role to leading new market development and recruitment [Doc. 1 ¶¶ 37–38; Doc. 27, p. 11]. However, plaintiff claims Cottles used this position to develop markets and recruit employees for another automobile glass company, Arrow Auto Glass ("Arrow") [Doc. 1 ¶ 39; Doc. 27, p. 17].

4

### C.    The "Conspiracy" with Arrow

On July 18, 2024, Buddy Flowers, the director of sales and operations for Arrow, stated in LinkedIn and Facebook posts that Arrow "is aggressively expanding our business and currently seeking the best Technicians, Sales Reps, CSR's, Operations Managers, and Recalibration Techs across our current footprint and eager to expand into new markets" [Doc. 1 ¶ 40; Doc. 27, pp. 1–2].   Consistent with this statement, Flowers began communication with Cottles about leaving plaintiff for Arrow [Doc. 1 ¶ 41].  Cottles, along with other individual defendants, also identified potential employees of plaintiff who could help Arrow expand into new markets, such as Tennessee or Alabama, where Arrow had no locations [*Id*.; Doc. 27, p. 2].

Cottles identified (1) Melissa Roebuck, a CSR in plaintiff's Huntsville office, who would leave plaintiff for Arrow, (2) Connie Carter, a sales rep who covered customers for plaintiff's Huntsville office, as having customer contacts she could bring to Arrow; (3) Whitney Carter,[3] as a sales rep who covered customers in plaintiff's Chattanooga office, as having customer contacts she could bring to Arrow; (4) Michael Vernon, a sales rep who covered customers in plaintiff's Florence office, as having customer contacts he could bring to Arrow; and (5) Kimberly Weaver, a CSR in the plaintiff's Florence office, who could leave plaintiff for Arrow and assist in soliciting technicians to do the same [Doc. 1 ¶ 42; Doc. 27, pp. 11–12].  Flowers encouraged and supported Cottles's attempts to solicit

---

[3]  Connie and Whitney Carter are mother and daughter, respectively [Doc. 1 ¶ 42].  To avoid confusion, the Court will refer to each by their first names henceforth.

these individuals by authorizing Cottles to offer them employment and signing bonuses [Doc. 1 ¶ 42].

As part of her participation in the conspiracy with Cottles and Flowers, Roebuck began soliciting employees in the office she worked in to leave for Arrow, providing Arrow's applications, promising raises and signing bonuses, disparaging plaintiff, and even falsely claiming that plaintiff planned on firing some employees [*Id.* ¶ 47; Doc. 27, pp. 12–14]. Roebuck received Arrow employment applications from Cottles and Flowers and provided them, along with the promise of raises and signing bonuses, with the authority of Flowers and Arrow [Doc. 1 ¶ 48; Doc. 27, p. 14].

On August 5, 2024, Devon Richardson, a technician, overheard a phone call between Roebuck and Cottles in which Cottles stated that he had "confirmed all the benefits with the other company" and asked Roebuck to solicit technicians to leave for the other company [Doc. 1 ¶ 49; Doc. 27, p. 12]. Right after this call, Roebuck told Richardson that Cottles had "found [them] another company" and later texted Richardson a link to Arrow's website [Doc. 1 ¶ 49; Doc. 27, pp. 12–13]. When Richardson responded to this text, saying, "Doesn't even show them servicing in Alabama," Roebuck replied, "That's what [Cottles's] job will be . . . Getting it going" [Doc. 1 ¶ 49; Doc. 27, p. 13].

Roebuck also solicited KD Cherry, another technician, to leave plaintiff for Arrow, telling him that plaintiff was going to fire him and that she was going to work for Arrow with Cottles [Doc. 1 ¶ 50; Doc. 27, p. 13]. Cherry received a text from an acquaintance of Roebuck's which stated:

6

> Brian was told to fire you 2 days ago. Don't be bullied to stay there. Some people have your back and it's no one at aaa. You make the decision that's best for you. Just keep in mind, that when the sales rep gets all the business switched over, they will only need one tech. Just don't want to see you get screwed over. Some people do care about you. And you can't be sued for leaving a job … idiots…

[Doc. 1 ¶ 50; Doc. 27, p. 13]. The sales rep referred to in the text is alleged to be Connie, who agreed to join Cottles at Arrow [Doc. 1 ¶ 51]. Roebuck confirmed in the text message to Cherry that Connie's role in the conspiracy would be to get the business switched over to Arrow [*Id*. ¶ 52; Doc. 27, p. 13].

Roebuck also texted Josh Reed, a CSR at plaintiff's Huntsville office, about leaving for Arrow, telling him that she, Cottles, and Connie were leaving and Arrow wanted him as well [Doc. 1 ¶ 53; Doc. 27, p. 13]. When Roebuck met with Reed, she explained that Cottles had asked her to recruit plaintiff's employees for Arrow [Doc. 27, p. 13]. Roebuck also informed Reed that Connie was contacting plaintiff's employees and asking them to take their business to Arrow [*Id.* at 14]. Later, Roebuck provided Reed with an employment application for Arrow and instructed him on how to complete it, including what position to apply for and how much compensation to ask for [*Id.*]. Reed believed Roebuck was offering him a job with Arrow [*Id.*]

### D. Discovery of "Conspiracy" and Termination of Individual Defendants

According to plaintiff, Roebuck, Cottles, and Connie conspired with Flowers in secret in order to prevent plaintiff from discovering their conduct, protecting confidential information, and preventing employees from leaving [Doc. 1 ¶ 57]. As a result, plaintiff did not learn any facts suggesting a conspiracy to steal clients, customers, trade secrets,

7

and employees, until August 13, 2024 [*Id.* ¶ 58]. Upon learning of the conspiracy, plaintiff decided to terminate Cottles, Roebuck, Whitney, Connie, Weaver, and Vernon, but knowing they were going to be terminated, these employees refused to respond to plaintiff's communications [*Id*. ¶ 59; Doc. 27, pp. 14–15]. Accordingly, plaintiff sent letters on August 14, 2024, terminating these individual defendants and requesting they cease and desist from recruiting other employees [Doc. 1 ¶ 60; Doc. 27, p. 15]. These letters also requested that the individual defendants, in anticipation of litigation,

> Refrain from deleting, destroying, or altering any documentation, including but not limited to emails, text messages, social media, relating to or derived from your employment with [plaintiff], your communication with [plaintiff's] customers, clients, and employees, and your communication with Arrow [] or any other prospective employer.

[*Id.*]. Additionally, the letters requested the return of company property, including cell phones and laptops, by August 15, 2024 [*Id.*].

Despite the letters' litigation hold request, each of these individual defendants conducted a factory reset on their cell phones, effectively deleting all information on the phones [Doc. 1 ¶ 61; Doc. 27, p. 15]. While a significant amount of data was successfully deleted, some emails and text messages were retrieved [Doc. 1 ¶ 62; Doc. 27, pp. 15–16]. For example, it was discovered that Cottles received information of a new hire of plaintiff on August 12, 2024 [Doc. 1 ¶ 62; Doc. 27, p. 16]. Cottles forwarded this information, which included protected information such as the new hire's social security number, to his personal email address [*Id.*]. Cottles also forwarded information regarding benefits that plaintiff provides to its employees [*Id.*].

8

### E. "Conspiracy" Continuation

After Cottles was terminated, he was still able to continue the conspiracy [Doc. 1 ¶ 63]. Specifically, during his employment, Cottles's area included the Pensacola location [*Id.*]. While working for plaintiff, Cottles, along with Flowers, contacted the Pensacola store manager, Aaron Randall, offering Randall financial incentives to leave for Arrow and to solicit other employees to do the same [*Id.*; Doc. 27, p. 17]. On August 19, 2024, Randall and all the technicians in the Pensacola office quit [Doc. 1 ¶ 67; Doc. 27, p. 16]. The same day, Randall spoke with James Dorris, owner of plaintiff, and confirmed that Cottles put him in contact with Flowers and that he had spoken with Flowers leading up to the departure [Doc. 1 ¶ 68; Doc. 27, pp. 16–17]. Also on this day, Randall texted Cottles's work phone, which had already been returned to plaintiff, saying, "We're all gone now. I will call you when Chelsea [Walden] drops everything off" [Doc. 1 ¶ 69; Doc. 27, p. 17].

### F. Harm to Plaintiff

As a result of the efforts of Flowers and Cottles, as well as the other defendants, plaintiff asserts that it has and will continue to lose significant business [Doc. 1 ¶ 71; Doc. 27, pp. 17–19]. And after losing 12 employees, plaintiff has expended significant resources hiring qualified technicians, CSRs, and sales reps in an attempt to keep the locations in Huntsville, Florence, Chattanooga, and Pensacola running [Doc. 1 ¶ 71; Doc. 27, pp. 17–18].

9

### G. Instant Action

On October 2, 2024, plaintiff brought this action against defendants [Doc. 1]. Plaintiff alleges, against the individual defendants,[4] breach of fiduciary duties and duties of loyalty, intentional inference with business relationships, tortious interference with employment agreements, and tortious interference with contracts [*Id.* ¶¶ 74–99]. Further, against all defendants, plaintiff alleges violations of the Defense of Trade Secrets Act ("DTSA") and the Tennessee Uniform Trade Secrets Act ("TNUTSA"), unfair competition under Tennessee law as well as the theory of civil conspiracy and concert of action [*Id.* ¶¶ 100–52]. Now before the Court is plaintiff's Motion for Preliminary Injunction [Doc. 26], in which plaintiff seeks a preliminary injunction to prohibit defendants from (1) using plaintiff's confidential trade secrets, including its client list, price list, and rebate information; (2) contacting current employees of plaintiff and soliciting them to leave plaintiff; and (3) contacting current customers of plaintiff and soliciting their business away from plaintiff.

## II. Standard of Review

Under Federal Rule of Civil Procedure 65, a party may seek injunctive relief if it believes it will suffer irreparable harm or injury during the pendency of the action. *See* Fed. R. Civ. P. 65. "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances

---

[4] The Court uses the phrase "individual defendants" to refer to Brandon Cottles, Melissa Roebuck, Connie Carter, Whitney Carter, Michael Vernon, Aaron Randall, Kimberly Weaver, Tracy Bragg, and Chelsea Walden.

10

clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

In determining whether to grant a plaintiff's request for a preliminary injunction, the Court must consider four factors:

> (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction.

*Id*. Although courts are to balance each of these factors in making their determination, "even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019) (internal quotation marks omitted).

## III.    Analysis[5]

### A.    Likelihood of Success on the Merits

"To establish a likelihood of success on the merits, 'a plaintiff must show more than a mere possibility of success.'" *Doe v. The Ohio State Univ.*, 136 F. Supp. 3d 854, 862 (quoting *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (*Six Clinics*).    In fact, a plaintiff must "establish[] a substantial likelihood or probability of success on the merits." *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 635 (6th Cir. 2010) (citation omitted).    "[I]t is ordinarily sufficient if the plaintiff has raised

---

[5]    The Court notes that the individual defendants in this case adopted Arrow's responsive brief as part of their response to plaintiff's motion for preliminary injunction [Doc. 38, p. 2 n.1].

11

questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (quoting *Six Clinics*, 119 F.3d at 402).

While plaintiff alleges numerous causes of actions against defendants, it focuses primarily on three for purposes of its motion: (1) breach of the duty of loyalty; (2) intentional interference with a business relationship; and (3) trade secrets misappropriation under the TNUTSA and DTSA [Doc. 27, pp. 22–32]. The Court turns first to the breach of the duty of loyalty.[6]

### 1. Breach of Duty of Loyalty[7]

"Under Tennessee common law, the duty of loyalty imposes upon an employee an obligation to act solely for the benefit of the employer in matters within the scope of his employment during the course of his employment." *Int'l Sec. Mgmt. Grp. Inc. v. Sawyer*, 3:06-cv-456, 2006 WL 1638537, at *10 (M.D. Tenn. June 6, 2006). An employee should not compete with his employer "while still employed, regardless of whether an actual noncompetition agreement exists." *Id.*; *accord F.S. Sperry Co., Inc. v. Schopmann*, 304 F. Supp. 3d 694, 707 (E.D. Tenn. 2018) (*F.S. Sperry*). "Competing with an employer encompasses, for example, 'an employee who solicits . . . coworkers to leave their jobs to

---

[6] Given the Court's discussion and findings *infra*, and in consideration of the scope of plaintiff's requests for preliminary injunction, the Court does not find it necessary to address the claim of intentional interference with business relationships, particularly because of the common evidence between claims.

[7] The parties do not appear to dispute the application of Tennessee law in this case.

12

work for a competitor while the soliciting employee is still being paid by the employer.'"

*F.S. Sperry*, 304 F. Supp. 3d at 707 (quoting *Ram Tool & Supply Co. v. HD Supply Constr. Supply Ltd.*, M2013-02264-COA-R3-CV, 2016 WL 4008718, at *5 (M.D. Tenn. July 21, 2016)).

### i. Individual Defendants

Plaintiff submits that the individual defendants, while still employed by plaintiff and on plaintiff's payroll, breached their duties of loyalty in two ways: (1) by soliciting plaintiff's employees to leave plaintiff for Arrow; and (2) by soliciting plaintiff's customers to leave plaintiff for Arrow [Doc. 27, p. 23]. In support of this argument, plaintiff points to the affidavits of Richardson, Reed, and Cherry, contending that they indicate that Cottles instructed Roebuck to recruit other employees to work for Arrow while both defendants were employed with plaintiff [*Id.* (citing Doc. 26-3 ¶ 8; Doc. 26-4 ¶¶ 7–8; Doc. 26-5 ¶ 4)]. Connie, plaintiff asserts, was also involved, confirmed by a text message sent to Cherry [*Id.* (citing Doc. 26-3 ¶ 8; Doc. 26-4 ¶¶ 7–8; Doc. 26-5 ¶ 4)]. As to the other individual defendants, plaintiff concedes that it currently lacks documentation linking them to the conspiracy, but it expects that such evidence will be discovered in the litigation process, noting it is likely these individual defendants also solicited plaintiff's employees [*Id.* at 24].

In their response, the individual defendants set forth two primary arguments; however, these arguments focus mainly on the scope of the injunction plaintiff seeks and not the claims against them here [Doc. 38, p. 4]. First, the individual defendants submit

13

that this cause of action reflects prior conduct while the purpose of plaintiff's motion, contrarily, is to prevent the individual defendants from soliciting plaintiff's customers *in the future* [*Id.*]. Second, the individual defendants emphasize the lack of a restrictive covenant in this case, arguing that, as such, plaintiff has no legal basis for seeking a prohibition on future solicitation [*Id.*].

Beginning with Cottles and Roebuck, the Court finds that plaintiff has met its burden as to these individual defendants regarding the claim of the breach of duty of loyalty. Specifically, at the direction of Cottles, Roebuck solicited two technicians, Richardson and Cherry, and one CSR, Reed, at plaintiff's Huntsville location to go work for Arrow.[8] On August 5, 2024, Roebuck notified Richardson that she had been tasked with picking the technicians for the "new company" Cottles had found for them [Doc. 26-4 ¶ 7; *see* Doc. 26-2 ¶ 24]. Roebuck told Richardson that Cottles had even negotiated "pay and benefits for people who quit" plaintiff's business and joined the "new company" [Doc. 26-4 ¶ 8]. When Roebuck later identified the "new company" as Arrow, Richardson questioned Arrow's lack of an Alabama location [*Id.* ¶ 8, p. 5] In response, Roebuck advised Richardson that Cottles's job would be to start an Alabama location [*Id.*]. The next day, Roebuck questioned Richardson as to whether he was going to leave plaintiff for Arrow [*Id.* ¶ 9].

---

[8] These events occurred when Cottles and Roebuck were employed with plaintiff [*See* Doc. 26-4 ¶ 7].

14

Roebuck solicited Cherry differently, warning him that he was going to be fired, and that she, Cottles, and Reed were leaving for Arrow [Doc. 26-3 ¶ 8]. When Roebuck revealed her role in recruiting other employees for Arrow, Cherry expressed hesitation at leaving [*Id.*]. To this, Roebuck reiterated that Cherry would be fired, particularly because "all the business" was going to leave plaintiff [*Id.*]. Cherry also later received a text message from an acquaintance of Roebuck's, which stated he was supposed to be fired, that plaintiff would only need one technician once "the sales rep gets all the business switched over," and that he could not "be sued for leaving a job" [*Id.* ¶ 9, p. 5].

Next, after telling Reed that she, along with others, would be leaving for Arrow, Roebuck informed Reed that Arrow wanted to hire him [Doc. 26-5 ¶ 6].[9] Roebuck explained to Reed what she had also explained to Cherry and Richardson, that is, that she was entrusted by Cottles with recruiting employees of plaintiff's to leave for Arrow [*Id.* ¶ 7]. When Reed expressed interest, Roebuck gave him an application for Arrow, later instructing him on how to fill it out [*Id.* ¶ 7, pp. 4–16].

The Court also notes that Randall informed Dorris that Cottles had stated that he, as well as other employees at plaintiff's Pensacola location, could earn more money at Arrow [Doc. 26-2 ¶ 29].[10] Given this, and all the above, the Court finds that plaintiff has met its

---

[9] The Court notes that the paragraphs in Reed's affidavit are misnumbered. Thus, the Court's citations to these paragraphs are not by their label but by the numerical order in which they appear.

[10] Additionally, while circumstantial, Dorris indicated that upon a search of Cottles's work emails, it was discovered that he had forwarded a new hire's information to his personal address, for which he would have no legitimate business reason to do as an employee of plaintiff's [Doc. 26-2 ¶ 30].

burden for the duty of loyalty claim as to Cottles and Roebuck at this stage of the litigation, specifically regarding the solicitation of employees.

Turning to Connie, the Court also finds that plaintiff has met its burden as to her regarding the claim of the breach of duty of loyalty. In his affidavit, Reed affirmed that Roebuck had expressly stated that Connie, "who managed sales for the Huntsville, Alabama location, was contacting AAA customers and asking them to take their business to Arrow" [Doc. 26-5 ¶ 7]. In Cherry's affidavit, he made a similar statement [*See* Doc. 26-3 ¶ 8]. Undoubtedly, soliciting customers to move plaintiff's business to Arrow's business, while being employed with plaintiff, is not "act[ing] solely for the benefit of the employer." *See Int'l Sec. Mgmt. Grp. Inc.*, 2006 WL 1638537, at *10. As such, and considering the above evidence, plaintiff has exhibited a strong likelihood of success on the claim of the breach of duty of loyalty as to Connie.

As to the remaining individual defendants, plaintiff concedes it does not have evidence presently linking them to the "conspiracy" [*See* Doc. 27, p. 24]. Therefore, the Court cannot find that plaintiff has met its burden for the breach of duty of loyalty claim as to the remaining defendants.

## ii. Defendant Arrow

As to Arrow, plaintiff contends it was involved in the individual defendants' breach of the duty of loyalty as a conspirator [*Id.* at 23].[11] In support of this contention, plaintiff

---

[11] "The elements of a cause of action for civil conspiracy are (1) common design between two or more persons[,] (2) to accomplish by concerted action an unlawful purpose, or a lawful

16

first highlights that Randall confirmed that he was contacted not only by Cottles but also by Flowers [*Id.* (citing Doc. 26-2 ¶ 29)]. And specifically, Flowers promised Randall more money to work at Arrow, establishing that Flowers had been informed of how much plaintiff pays its employees by Cottles [*Id.*]. Second, plaintiff notes that Roebuck had indicated that Cottles was negotiating pay and benefits with Arrow on behalf of other employees he was soliciting [*Id.* at 23 (citing Doc. 26-4 ¶ 8)]. Third, plaintiff maintains that Arrow clearly encouraged Roebuck's efforts as she was provided with copies of Arrow's employment applications, and she instructed some employees on how to complete the application, "including how much compensation to request" [*Id.* (citing Doc. 26-5 ¶ 4)].

In response, Arrow altogether denies that Flowers, or any other employee, engaged in any "conspiracy" to unlawfully steal plaintiff's business [Doc. 34, p. 4]. Rather, Arrow maintains that after Flowers posted on his LinkedIn about Arrow "aggressively expanding" its business, Cottles contacted Flowers without solicitation [*Id.* at 3]. Arrow contends that Cottles and Flowers met, discussed the possibility of Cottles leaving plaintiff to work for Arrow, and confirmed that Cottles was not subject to any restrictive-covenant agreement [*Id.*]. At a later time, Arrow avers that three additional employees of plaintiff's, Connie,

---

purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury to the plaintiff." *F.S. Sperry Co.*, 304 F. Supp. 3d at 708 (quoting *Lapinksy v. Cook*, 536 S.W.3d 425, 444 (Tenn. Ct. App. 2016)). Plaintiff's reply to Arrow's response is the first time either party explicitly addresses these elements [*See* Doc. 36, pp. 11–14]. In its reply, plaintiff contends that Arrow and the individual defendants "had a common goal—to open new Arrow locations by taking AAA's business and employees—and each party had their own responsibility in achieving that goal" [*Id.* at 11]. Further, plaintiff submits that Flowers and the individual defendants engaged in numerous tortious acts, and Arrow, "as a co-conspirator, is responsible for the consequences of those actions" [*Id.* at 13].

Whitney, and Vernon, initiated contact with Flowers, and Arrow eventually offered them employment [*Id.* at 3–4]. Subsequently, the remainder of the individual defendants "completed applications for employment and Arrow offered them employment in its continued efforts to grow its business" [*Id.* at 4].

After review of the evidence, the Court finds that plaintiff has satisfied its burden as to Arrow here. First, Richardson avers that he heard Cottles state that since he had confirmed the pay and benefits with Arrow, he just needed "the people" [Doc. 26-4 ¶ 7]. Richardson was also told substantially the same from Roebuck, who confirmed that "the people" were those who quit plaintiff's business and leave for Arrow [*Id.* ¶ 8]. From this evidence, the Court can identify a common plan, *i.e.*, to get plaintiff's employees to leave for Arrow, and an overt act by Arrow, *i.e.*, negotiating the "pay and benefits" of such new employees with Cottles.[12] Additionally, as told by Reed, Roebuck provided him with an Arrow employment application, instructing him on what position to apply for and how much to for hourly wage expectation [Doc. 26-4 ¶ 7, pp. 4–16]. This further affirms Cottles getting the "pay" confirmed with Arrow. The Court also notes that in his texts to Roebuck, Reed states, "Let me know what Brandon [Cottles] says. And when will we get computers and stuff" [*Id.* at 4–5]. Reed's message appears to indicate a direct line from Cottles to Arrow, as Cottles was to know the details of employee onboarding for Arrow.

---

[12] Furthermore, Roebuck informed Richardson that Cottles's "job" would be to start up Arrow's servicing in Alabama, not only indicating a plan between Arrow and Cottles but also indicating a need for Cottles to solicit plaintiff's employees already in the Alabama area [*See* Doc. 26-3 ¶ 8, p. 4].

18

Based on all the above, the Court finds that plaintiff has met its burden as to Arrow here, particularly in regard to the solicitation of employees. As to soliciting customers, and this being part of the "conspiracy" to which Arrow was a part of, the Court is not convinced given the present, limited evidence. Specifically, the solicitation of customers currently hinges on Roebuck's statements as to Connie and perhaps a loss of customers by plaintiff; however, the Court lacks evidence of a common plan between Arrow and any of the individual defendants to solicit customers from plaintiff and bring them to Arrow.

### 2. Trade Secrets Misappropriation

As stated previously, plaintiff has brought claims of trade secret misappropriation under both the DTSA and TNUTSA and argues that it is likely to succeed on the merits of these claims for purposes of a preliminary injunction [Doc. 27, pp. 27–32]. "The respective requirements for establishing misappropriation under these statutes are largely the same, and so the Court will conduct a single analysis." *Gep Admin. Srvs., LLC v. Wiseman*, No. 3:24-CV-256, 2024 WL 1019277, at *5 (M.D. Tenn. Mar. 8, 2024) (quoting *PSC Indus., Inc. v. Johnson*, No. 3:19-CV-362, 2021 WL 1663574, at *11 (M.D. Tenn. Apr. 28, 2021)). To succeed on a trade secrets misappropriation claim, a plaintiff must show: "(1) the existence of a trade secret; (2) misappropriation of the trade secret by the defendants; and (3) resulting detriment to the plaintiff." *ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 962 (M.D. Tenn. 2011) (citation omitted). To be considered a trade secret, TNUTSA lists three requirements: "(1) the information must derive independent economic value from not being generally known, (2) others could obtain economic value from its

19

disclosure or use; and (3) efforts have been made to maintain secrecy." *Gep Admin. Srvs., LLC*, 2024 WL 1019277, at \*5 (quoting *J.T. Shannon Lumber Co. v. Barrett*, No. 2:07-CV-2847, 2010 WL 3069818, at \*4 (W.D. Tenn. Aug. 4, 2010)).

### i. Existence of Trade Secret

Plaintiff begins by arguing that its client lists, price lists, and rebate information are confidential trade secrets according to TNUTSA requirements [Doc. 27, p. 29]. As to the first requirement, plaintiff contends that the information has economic value because plaintiff "spends time and money negotiating the terms of pricing and rebates" and "training sales rep[s] to develop clients" [*Id.*]. Keeping this information confidential, plaintiff maintains, helps it "compete with other glass companies" [*Id.*]. Specifically, by negotiating pricing for goods sold from vendors and negotiating customer-specific pricing for goods sold to customers, plaintiff can retain a competitive advantage in the industry [*Id.* at 29–30].

Next, plaintiff contends that if its client lists, price lists, and rebate information was disclosed, its competitors, like Arrow, could obtain economic benefit [*Id.* at 30]. Specifically, in knowing plaintiff's pricing and rebate information for its clients, Arrow could undercut plaintiff's deal terms, inducing such clients to take their business to Arrow [*Id.*]. Additionally, plaintiff avers that disclosure of its client lists, which includes histories of discounts and historical compilations of products and services provided to such clients, would enable defendants to steal plaintiff's clients by offering the same services at lower rates [*Id.*].

20

Finally, plaintiff asserts that it took efforts to protect its confidential trade secrets, noting that price lists were kept on OMEGA software with varying levels of employee accessibility and password-protected logins [*Id.* (citing Doc. 26-2 ¶¶ 14, 15)]. As to rebate information, plaintiff submits that this information is not provided to CSRs or managers "unless and until the sales of a particular product are nearing qualification for a rebate" [*Id.* (citing Doc. 26-2 ¶ 16)]. Lastly, plaintiff highlights that the individual defendants were aware of the confidentiality of plaintiff's the client lists, price lists, and rebate information due to training and information contained in its handbook [*Id.* (citing Doc. 26-2 ¶ 17; Doc. 19 ¶ 24)].

As noted in one of plaintiff's reply briefs, defendants do not appear to dispute that the information plaintiff claims are trade secrets are, in fact, trade secrets [Doc. 39, p. 7].

"Business information such as pricing and customer sales information may constitute a protected trade secret . . . where such information is not publicly known or otherwise ascertainable by proper means." *Smart & Assocs., LLC v. Indep. Liquor (NZ) Ltd.*, 226 F. Supp. 3d 828, 856 (W.D. Ky. 2016) (citations omitted); *accord C-Ville Fabricating, Inc. v. Tarter*, No. 5:18-CV-379, 2019 WL 1368621, at *13 (E.D. Ky. Mar. 25, 2019) (noting that trade secrets may include "costs and price lists, marketing and business strategies, inventory and pricing costs, and calculations related to profit margins"). Similarly, client information may constitute a protected trade secret if such information has economic value and is not publicly available. *See James B. Oswald Co. v. Neate*, 98 F.4th 666, 675–77 (6th Cir. 2024). "Thus, a client list entitled to trade secret

21

status 'typically includes not only the name of the business but information not available to the public, such as the name of a contact person, a non-public telephone or cell phone number, an email address, and other pertinent business data known only because of the client relationship.'" *QFS Transp., LLC v. Murphy*, No. 1:21-CV-770, 2022 WL 345182, at *5 (S.D. Ohio Feb. 4, 2022) (quoting *Columbus Bookkeeping & Bus. Servs., Inc. v. Ohio State Bookkeeping, L.L.C.*, No. 11AP-227, 2011 WL 693840, at *4 (Ohio App. 10th Dist. Dec. 30, 2011)). "All this information, together, *is* the value of a client list." *Id.* (citation omitted) (emphasis in original); *accord Stockton Mortg. Corp. v. Bland*, No. 3:22-CV-36, 2022 WL 17836590, at *6 (E.D. Ky. Dec. 21, 2022) (citation omitted) (stating that while "a list 'discoverable only through extraordinary efforts and through many years' expenditure of time and money'" may be a trade secret, a list that merely identities purchasers of a given product or service that may be obtained through legitimate channels such as the internet would not constitute a trade secret).

The Court finds that plaintiff's client lists, price lists, and rebate information constitute trade secrets. Starting with plaintiff's client lists, these have independent economic value from not being generally known, and others could obtain economic value from their disclosure or use. *See Gep Admin. Srvs., LLC*, 2024 WL 1019277, at *5 (citation omitted). Specifically, plaintiff's client lists contain not readily ascertainable information, particularly the contact information of client representatives, the personal information of some of these clients or their contacts, and histories of discounts with clients [Doc. 27 (citing Doc. 26-2 ¶ 11)]. *See QFS Transp., LLC*, 2022 WL 345182, at *5 (citation omitted).

22

And this information is economically valuable because of the time and efforts involved in its compilation, and as plaintiff states, the disclosure of its records of negotiated discounts with clients could allow competitors to undercut plaintiff's prices. As to secrecy, plaintiff expresses that client information is available to employees, specifically CSRs and store managers, for the purpose of client satisfaction, but that all employees are informed in training and via plaintiff's handbook that client lists are confidential and should not be shared with competitors [Doc. 27, pp. 9–10 (citing Doc. 26-2 ¶ 17; Doc. 26-5 ¶ 3)].

Plaintiff's price lists and rebate information[13] are more obviously trade secrets. As provided by plaintiff, the price lists involve negotiated prices for costs of materials and goods from vendors and customer-specific pricing for goods and services sold to customers, including discounted prices for repeat customers and clients [Doc. 27, pp. 6–8, 29–30 (citations omitted)]. Plaintiff's rebate information includes agreements negotiated between plaintiff and the vendors, including the sales threshold and amount of the rebate [*Id.* at 6 (citing Doc. 26-2 ¶ 9]. Thus, plaintiff's price lists and rebate information facilitate plaintiff's ability to "stay competitive in a competitive industry" by allowing them to set competitive, yet profitable prices for services and attractive, yet lucrative prices for materials [*Id.*]. In other words, plaintiff's price lists and rebate information are economically valuable, particularly because they are not generally known to competitors. As follows, if this information was disclosed, competitors could obtain economic value by

_____

[13] The Court notes that plaintiff's "rebate information" appears to be contained within its price lists [*See* Doc. 27, p. 6].

23

again, undercutting plaintiff's prices. Plaintiff has also sufficiently shown that it made efforts to maintain secrecy through password-protected, employment-level dependent access and a need-to-know basis for rebate information [*Id.* at 8–9, 30]. And, as with the client lists, plaintiff's employee handbook and training informed its employees of the confidential nature of its price lists and rebate information [*Id.* at 9–10 (citing Doc. 26-2 ¶ 17; Doc. 26-5 ¶ 3)].

Having established its client lists, price lists, and rebate information are trade secrets, the Court will next evaluate whether plaintiff has met its burden as to the element of misappropriation.

## ii. Misappropriation

Plaintiff asserts that defendants misappropriated its trade secrets by acquiring them through improper means [Doc. 27, p. 30]. Specifically, to meet Arrow's goal of aggressive expansion, the individual defendants brought plaintiff's client lists, price lists, and rebate information while still employed with plaintiff [*Id.* at 31]. The client lists, plaintiff alleges, ensured that Arrow would immediately have business through plaintiff's insurance agent clients that were induced to leave plaintiff by the individual defendants [*Id.*]. And the price lists and rebate information allowed Arrow to negotiate competitive pricing arrangements with potential and existing customers of plaintiff [*Id.*].

In support of these allegations, plaintiff again points to the conduct of Roebuck and Connie [*Id.*]. Specifically, Roebuck conveyed the message that salespeople were getting "all the business switched over" and used such message to solicit technicians to leave for

24

Arrow, representing that there would be no jobs for them once plaintiff lost its business [*Id.* (citing Doc. 26-3 ¶¶ 8–9)]. Further, Roebuck reported, and text messages indicated, that Connie was contacting plaintiff's customers, asking them to leave for Arrow [*Id.* (citing Doc. 26-2 ¶ 36; Doc. 26-5 ¶ 4)]. Connie also recommended to her State Farm insurance agent to stop doing business with plaintiff [*Id.* (citing Doc. 26-2 ¶ 36]. Plaintiff submits that these clients could not have been induced away from plaintiff if defendants "had not misappropriated the price lists and rebate information that [plaintiff] offered its clients such that Arrow could offer lower prices and better deal terms" [*Id.* at 31–32].

In response, Arrow emphasizes that plaintiff never alleges that Arrow is in possession of or has access to any of plaintiff's confidential information [Doc. 34, p. 8]. Rather, plaintiff only alleges that certain individual defendants, at some point during their respective employment with plaintiff, had access to plaintiff's trade secrets [*Id.*]. And even so, "the only substantive allegation of misappropriation" was the text message about getting "all the business switched over" [*Id.*]. In total, Arrow asserts that plaintiff's misappropriation claim is speculative at best [*Id.* at 9].

The individual defendants in this case respond similarly, submitting they do not have any of plaintiff's confidential information and have not used any information at any time [Doc. 38, p. 3]. As such, the individual defendants represent that they have no objection to plaintiff's motion as it relates to its confidential information, *i.e.*, its client

25

lists, price lists, and rebate information, as the individual defendants "have no such information and no intent to use such information" [*Id.*].[14]

"'Misappropriation' means, in relevant part, either acquisition by a person who knows or has reason to know the trade secret was acquired by improper means, or disclosure without consent of a trade secret by a person who knows or has reason to know that it was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." *Williams-Sonoma Direct, Inc.v. Arhaus, LLC*, 109 F. Supp. 3d 1009, 1017–18 (W.D. Tenn. 2015) (citing Tenn. Code Ann. § 47-25-1702(2)). "Improper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or limit use, or espionage through electronic or other means." Tenn. Code Ann. § 47-25-1702(1).

Based on the evidence before it, the Court cannot conclude that plaintiff has shown a substantial likelihood of success on the merits in terms of the element of misappropriation. Plaintiff provides limited evidence in support of this element: a text message from Roebuck to Cherry, Roebuck's solicitation of technicians, Roebuck's report that Connie was asking plaintiff's customers to go to Arrow, and ambiguous text messages sent by a State Farm Insurance Agent to Connie. Plaintiff asks the Court to take this

---

[14] The individual defendants do note that the "simple identity of a company," even if a customer of plaintiff's, is not confidential [Doc. 38, p. 3]. Further, the individual defendants submit that there is no great secret in identifying potential auto glass customers, and as such, no confidential information is needed for business development in the auto glass industry [*Id.*]. Therefore, the individuals submit that they should not be prohibited from contacting or doing business with any such entity [*Id.*].

26

evidence and presume that it must mean that the individual defendants gave Arrow plaintiff's trade secrets. This the Court cannot do.

First, Roebuck's text message to Cherry, her solicitation of technicians by telling them plaintiff would lose its business, and her report that Connie was sending customers to Arrow certainly indicate a solicitation of plaintiff's customers while Roebuck and Connie were employed with plaintiff, in breach of the duty of loyalty. However, these pieces of evidence do not inherently imply a use of trade secrets, and the solicitation of such customers could be accomplished without the use of trade secrets. For example, such solicitation could also be achieved through the disparagement of plaintiff's business reputation or practices or with the assurance that plaintiff's CSRs and sales reps, who developed relationships with these customers, would be leaving for a new company, Arrow.

Second, the Court does not agree with plaintiff's conclusion that the text messages sent by the State Farm Insurance agent[15] demonstrate that Connie had recommended that State Farm stop doing business with plaintiff. The first text message, received on August 20, 2024, states, "Hey, I can't believe AAA did that to you??? Where are you at now?" [Doc. 26-2, p. 46]. The second message, received on August 28, 2024, states,

> I thought I text[ed] you the other day, but it must have been your old number. This is Diana. Kirstin told me about you moving companies. I'll never recommend AAA again . . . . . . call me tomorrow[.]

---

[15] The Court notes plaintiff's statement that insurance agents "in its customer lists can be found by searching the internet or a phonebook[,]" meaning it is publicly available [*See* Doc. 27, p. 7].

27

[*Id.*]. The Court notes that on August 14, 2024, Connie was terminated as an employee of plaintiff's [*id.* at 14–15], and the agent's first text appears to be a reaction to learning about this termination. Interestingly, however, the agent did not know where Connie would be going after her termination with plaintiff until the agent was informed by another person, "Kirstin" [*Id.* at 46]. This appears to counter plaintiff's claim such that, if State Farm has been solicited to go to Arrow by Connie, the agent would know where Connie was going after her termination. Additionally, the agent's statement that she would never recommend plaintiff again appears to be a response to Connie's termination, or at the most, a response to what "Kirstin" told the agent. Finally, when considering the text messages in conjunction, it does not signify that Connie and the agent communicated between the time when each was received. Specifically, if the two had communicated, the agent would have learned before "Kirstin" informed her that Connie had moved to Arrow.

Thus, considering all the above, and noting the lack of direct evidence of the utilization of customer discounts or customer-specific pricing, *i.e.*, trade secret information, the Court cannot find that plaintiff has shown more than a "mere possibility" of success as to its claim of misappropriation, at least at this juncture. Therefore, the Court need not address the third element of resulting detriment at this time.

### B. Irreparable Harm

"A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet*, 305 F.3d at 578. "Irreparable harm is an 'indispensable' requirement for a preliminary injunction, and 'even the strongest

showing' on the other factors cannot justify a preliminary injunction if there is no 'imminent and irreparable injury.'" *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (quoting *Sumner Cnty. Schs.*, 942 F.3d at 326–27). "If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *Sumner Cnty. Schs.*, 942 F.3d at 327 (emphasis in original). The injury complained of by plaintiff "'must be both certain and immediate,' not 'speculative or theoretical.'" *Id.* (quoting *Mich. Coal of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)).

Plaintiff submits that it has and will continue to suffer irreparable harm until defendants are ordered to stop using their trade secrets and stop contacting its current employees and clients [Doc. 27, p. 32]. Specifically, plaintiff alleges that it can demonstrate irreparable harm in three ways [*Id.* at 33]. First, plaintiff states that it has noticed "nearly immediate loss of business revenue" due to loss of its employees, clients, and trade secrets, citing to sales data [*Id.* at 33–34]. Second, plaintiff provides that it has had to pay relocation costs, salary increases, and training expenses to re-staff some of its locations [*Id.* at 34]. Moreover, plaintiff asserts that it does not know which of its other employees have been solicited, and the costs of protecting itself from the harm of further solicitation is not fully compensable by monetary damages [*Id.*]. Lastly, plaintiff contends that its business reputation and client relationships have been irreparably harmed by defendants' actions [*Id.*; Doc. 36, p. 15].

29

In response, defendants assert that plaintiff's injuries are merely monetary in nature, and in turn, plaintiff cannot prove that it will suffer irreparable harm [Doc. 34, p. 9; Doc. 38, p. 6].

Plaintiff is correct in that "[i]rreparable injury generally results from a competitor's misappropriation of trade secrets due to 'the potential for lasting and unjust competitive harm that would not otherwise occur.'" *Dayton Superior Corp. v. Yan*, No. 3:12-cv-380, 2012 WL 5497804, at *8 (S.D. Ohio Nov. 13, 2012) (quoting *Novak v. Farneman*, No. 2:10-CV-768, 2010 WL 4643002, at *6 (S.D. Ohio Nov. 9, 2010)); *accord Broad-Ocean Techs., LLC v. Lei*, No. 21-11297, 2021 WL 2258418, at *2 (E.D. Mich. June 3, 2021) (citations omitted) ("It is well established that the disclosure of trade secrets qualifies as irreparable harm."). However, the Court's finding at this stage that there is not a significant likelihood of success on the merits as to the claim of misappropriation of trade secrets undermines plaintiff's claim of irreparable harm. The Court notes again, however, that the individual defendants have expressed no opposition to the issuance of a preliminary injunction prohibiting them from using plaintiff's trade secrets [Doc. 38, p. 3].

As to plaintiff's claim of loss of business revenue, barring loss due to trade secret appropriation, the Court finds this harm to be compensable through monetary damages as these losses are readily calculable, evidenced by the sales data provided [*See* Doc. 26-2 ¶ 35]. Turning to plaintiff's assertion that it has had to incur financial expense to re-staff the locations from which employees left, this is not the type of injury a preliminary injunction concerns itself with as it is neither prospective nor imminent. *Sumner Cnty.*

30

*Schs.*, 942 F.3d at 327. Rather, plaintiff is referring to past harm. As stated above, plaintiff also emphasizes that it "strongly suspects that [d]efendants may continue to solicit" its employees [*See* Doc. 27, p. 34]. At best, this harm is speculative and cannot be addressed by a preliminary injunction. *See id.*

Lastly, the Court acknowledges that the Sixth Circuit has recognized that "damage to business reputation and loss of customer goodwill can constitute irreparable harm." *Kinzie Advanced Polymers, LLC v. Calyx Containers*, No. 1:24 CV 1887, 2025 WL 2418908, at *26 (N.D. Ohio Aug. 21, 2025) (citing *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 852 (6th Cir. 2017)). In support of its claim of harm as to its reputation and client relationships, plaintiff first states that Connie "disparaged" plaintiff to a State Farm Insurance agent, citing to the text messages received by this agent [Doc. 27, p. 34 (citing Doc. 26-2 ¶ 36)]. The Court discussed these text messages above at length, *see supra* Section III.A.2.ii, and concluded it could not determine that Connie had recommended to State Farm that it should stop doing business with plaintiff. As to the disparagement plaintiff references now, the Court similarly cannot find adequate proof of this within the text messages cited. Plaintiff also cites to Dorris's declaration which discusses plaintiff's decline in business and loss of its biggest client since several of the individual defendants left for Arrow [Doc. 27, pp. 34–35 (citing Doc. 26-2 ¶ 35)]. Dorris expresses that he "believes" these losses occurred due to several of the individual defendants contacting plaintiff's clients using plaintiff's trade secrets [Doc. 26-2 ¶ 35]. To the extent plaintiff again claims a "loss in business," the Court has addressed this

31

above. Regarding the loss of clients, the Court emphasizes that plaintiff has only presented sufficient evidence as to one individual defendant regarding the solicitation of customers. *See supra* Section III.A.1.i. Furthermore, plaintiff's reference to the usage of trade secrets is weakened by the Court's prior finding that there is not, presently, a significant likelihood of success on the merits as to the misappropriation of trade secrets. *See supra* Section III.A.2.ii.

For all the reasons set forth above, the Court finds that plaintiff has not shown a clear case of irreparable harm at this juncture, but the Court considers the individual defendants' non-opposition to an issuance of a preliminary injunction as to the usage of trade secrets.

### C. Substantial Harm to Others

Though not required given the Court's finding above, the Court will address whether others will be substantially harmed by the issuance of a preliminary injunction. "Courts must also consider the harm to others if an injunction were granted and 'balance the equities.'" *Superior Scape, Inc. v. JCB Design & Build, LLC*, No. 21-12889, 2022 WL 19189, at *6 (E.D. Mich. Jan. 3, 2022) (citations omitted).

Plaintiff asserts that defendants will not be substantially harmed by the issuance of a preliminary injunction [Doc. 27, p. 35]. Specifically, plaintiff contends that there is no undue burden in refraining from the misuse of another's confidential and proprietary information [*Id.* at 35–36]. Furthermore, plaintiff submits that defendants remain free to

32

competitively price products and services, develop client relationships, and seek employees without using their trade secrets or soliciting their employees [*Id.* at 36].

In response, defendants contend that the issuance of a preliminary injunction, according to the scope set forth by plaintiff, would prevent them from engaging in "ordinary competition," especially given the small customer-base at issue [Doc. 34, p. 9]. In particular, preventing Arrow from contacting current clients of plaintiff's would "strike at the core of Arrow's operations, and it would effectively prevent it from operating" [*Id.* at 9–10]. The individual defendants also note that, with no information as to which auto glass customers are plaintiff's, they run the risk of inadvertently reaching out to a customer that may be plaintiff's [Doc. 38, p. 6]. Additionally, the individual defendants raise the issue that the issuance of a preliminary injunction would prevent them from doing business with customers they may share with plaintiff [*Id.*].

The parties appear to agree that a preliminary injunction preventing defendants from the usage of trade secrets would not cause any harm to anyone else. However, the parties diverge as to the harm that would occur if the Court were to grant an injunction prohibiting defendants from contacting and soliciting plaintiff's customers and employees. Beginning with contacting and soliciting customers, the Court notes that while plaintiff makes this request separately from its request to prohibit the usage of trade secrets, plaintiff's concern with solicitation of its customers is undoubtedly underlined by the fear that defendants will use its trade secrets to induce customers to leave plaintiff for them. Thus, if the Court were to reframe plaintiff's request regarding its customers as really a reiteration of its request to

33

prohibit using trade secrets, it appears no harm would result given the ordinary and fair competition defendants speak to would remain. Further, this perspective would appear to also address the customer concerns raised by the individual defendants.

As to the solicitation of employees, Arrow does not present an argument that it would be harmed from refraining to solicit plaintiff's employees. The individual defendants, on the other hand, argue that such a preliminary injunction would impose a non-solicitation limitation on them despite the absence of a restrictive covenant [Doc. 38, p. 7].[16] While the Court acknowledges the lack of a restrictive covenant in this case, the Court fails to see how preventing defendants from soliciting plaintiff's employees would substantially harm the individual defendants, particularly when plaintiff is only *one* business within the auto glass industry.

### D. Impact on the Public Interest

Plaintiff submits that the public interest is served by protecting trade secrets and fostering fair competition [Doc. 27, pp. 35–36]. On the other hand, Arrow argues that, while plaintiff advocates for fair competition, the preliminary injunction would box them out of such ordinary competition given the limited market in which they both work [Doc. 34, p. 10]. The individual defendants submit that the preliminary injunction would have a negative impact on customer choice [Doc. 38, p. 7].

---

[16] While the individual defendants place this argument under the factor of public interest, the Court finds it more appropriate to address under the third factor, *i.e.*, substantial harm to others.

None of the defendants appears to contest the public interest in protecting trade secrets. *See Dearborn Mid-West Co., LLC v. FM Sylvan, Inc.*, No. 22-12114, 2022 WL 16716217, at *14 (E.D. Mich. Nov. 4, 2022) (quoting *Radiant Glob. Logistics, Inc. v. Furstenau*, 368 F. Supp. 3d 1112, 1135 (E.D. Mich. 2019)) ("The public has an interest in protecting trade secrets and it is 'axiomatic that the public has an interest in the enforcement of the legislative enacted laws.'"). As to Arrow's argument regarding "ordinary competition," the Court addressed this contention *supra*. Moving to the individual defendants' arguments, the Court disagrees that preventing them from contacting and soliciting plaintiff's customers would have a negative impact on customer choice. Specifically, plaintiff's request as to the prohibition of contacting and soliciting customers is a one-way street, meaning if customers reach out to defendants to choose their auto glass company, defendants would not be in breach of the injunction for responding to such inquiry.

## IV. Conclusion

Weighing all the factors, the Court first finds that a preliminary injunction prohibiting the usage of plaintiff's confidential trade secrets is appropriate, especially in light of the individual defendants' non-opposition. While plaintiff has not, at this juncture, exhibited a strong likelihood of success on the merits, the remaining factors weigh in favor of an injunction of this form. For the reasons discussed *supra,* the Court finds that an injunction prohibiting the usage of trade secrets will also adequately address plaintiff's underlying concern in its request to prohibit defendants from contacting and soliciting

plaintiff's customers. Specifically, defendants will be prohibited from utilizing plaintiff's trade secrets to induce plaintiff's customers to leave for Arrow. Finally, as to plaintiff's request to prohibit defendants from contacting and soliciting employees of plaintiff's, the Court does not find that, on balance, an injunction is warranted. In particular, the Court does not find that denying such an injunction would cause irreparable harm to plaintiff. *See Sumner Cnty. Schs.*, 942 F.3d at 326–37.

Accordingly, plaintiff's motion for a preliminary injunction [Doc. 26] is **GRANTED in part** and **DENIED in part**. Defendants are hereby enjoined and restrained during the pendency of this action from:

(1) Using plaintiff's trade secrets, specifically its client lists, price lists, and rebate information as discussed more fully in this Memorandum Opinion and Order.

This Order is effective immediately and shall remain in full force and effect until this action is otherwise disposed.[17]

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

---

[17] Federal Rule of Civil Procedure 65 provides, in relevant part, that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any part found to have been wrongfully enjoined or restrained. Fed. R. Civ. P. 65(c). "The Sixth Circuit advises district courts to expressly address the question of whether bond is required as security for a preliminary injunction." *PMP – Romulus, Inc. v. Valyrian Mach., LLC*, No. 23-CV-10822, 2023 WL 7127505, at *6 (E.D. Mich. Oct. 30, 2023) (citations omitted). "Nevertheless, the ultimate decision of the issue is within the discretion of the trial judge." *Id.* (citations omitted). None of the parties appear to address this issue in their briefing, and defendants do not allege what costs or damages they would sustain if an injunction were ordered. *See id.* Given this, and the nature of the injunction ordered in this case, the Court finds that no bond is necessary here.